
IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>IAN TAYLOR HIGGINS,<br><br>Defendant. | Case No. 1:24-cr-26-RDA |

## STATEMENT OF FACTS

The United States and the defendant, IAN TAYLOR HIGGINS (hereinafter, "HIGGINS" or "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. From at least in or about September 2021 through at least in or about March 2023, in the Eastern District of Virginia and elsewhere, IAN TAYLOR HIGGINS, unindicted co-conspirator 1 ("UCC-1"), unindicted co-conspirator 2 ("UCC-2") and others known and unknown to the United States, did knowingly and willfully conspire, confederate, and agree with each other to commit wire fraud that is, having knowingly devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1349.

2. HIGGINS, UCC-1, and UCC-2 conspired in an investment fraud scheme by which they worked together to offer automatic investment trading bots to trade forex and other securities on behalf of investors. While commonly referred to as a bot, they were also marketed as trading

1

algorithms. UCC-1 acted as the "marketer" or the "face" of the investment platform, whereas HIGGINS operated behind the scenes as a "developer" and provided "brokerage services." UCC-2 assisted HIGGINS. The conspirators made material false statements to collect fees and to obtain investors' funds. Specifically, UCC-1 benefited financially through the collection of subscription fees, whereas HIGGINS collected $4.00 trading fee for every time a trading transaction occurred. HIGGINS also took a portion of the underlying investments by which he was not entitled. For example, at least one investor's funds were never invested, instead HIGGINS, UCC-3, and others kept the funds for themselves. HIGGINS personally benefited by obtaining over $4.2 million.

*Background*

3. HIGGINS was the founder and owner of FXPrimary LLC ("FXP"). FXP was an online trading platform that purported to act as a brokerage house that would "manage" investor deposits. HIGGINS incorporated FXP in Saint Vincent and the Grenadines on October 30, 2020.

4. The website for FXP previously had a section stating that FXP was "regulated by The Securities Commission of the Bahamas ("SCB"), Registration No. SIA-F188. We are authorized by SCB to deal, arrange and manage securities." In August 2021, the Securities Commission of the Bahamas released a statement warning investors that FXP was not licensed by the Commission as it claimed to be. At some point after the SCB press release, FXP removed that wording from their website. As HIGGINS well knew at the time, FXP was not registered with the U.S. Securities and Exchange Commission ("SEC") nor with the Financial Industry Regulatory authority ("FINRA").

5. UCC-1 resides in Fairfax County within the Eastern District of Virginia. HIGGINS and UCC-2 reside outside the Commonwealth of Virginia.

6. On or about October 27, 2021, UCC-1 registered Entity 2 in Virginia. UCC-1, through Entity 2, offered bots to trade on behalf of investors. In addition to Entity 2, UCC-1 had other entities offering investment opportunities such as Entity 1. Entity 1 offered similar trading bots, but preceded Entity 2 in time.

7. UCC-1 through Entity 2 used FXP exclusively as its online brokerage.

8. Cryptocurrency is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency (currency which derives its value from government regulation or law, such as the dollar) to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin ("BTC") and Ether ("ETH"). Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.

9. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").

*Criminal Conduct*

10. UCC-1 utilized video-centric social media tools, primarily TikTok, YouTube, and Discord to post "educational" videos about investing in cryptocurrency and the stock market. UCC-1 built a following of hundreds of thousands of individuals on social media by promoting himself as an extremely successful, wealthy, and knowledgeable trader.

11. UCC-1 used various taglines to draw people into the investment scheme including "winning together" and "we beat the stock market every day." UCC-1 frequently made false and misleading claims, all with the purpose of enticing investors to pay fees for access to UCC-1's investment advice and a separate monthly fee to gain access to UCC-1's automated trading bots.

12. The first iteration of the scheme involved Entity 1. After most of the investors lost their complete investments in Entity 1, UCC-1 blamed the losses on a third party. He then pivoted to Entity 2, by which he conspired with HIGGINS, UCC-2 and others known and unknown to the United States.

13. UCC-1 described Entity 2 as "the ultimate hedge fund algorithm" that provided "automated trading while you play and sleep." After Entity 1 failed, as to Entity 2, UCC-1 told potential customers that he fully owned the software and developed the bots himself, assuring people that what happened with Entity 1 would not happen again. However, UCC-1 did not own the software, algorithm, or develop the bots used by Entity 2. Instead, HIGGINS edited an algorithm that he had previously purchased elsewhere.

14. UCC-1 also told his customers that he had a longstanding, close relationship with FXP. However, this was false as UCC-1 had known HIGGINS for less than 3 months when UCC-1 began publicizing the bots to the public online.

15. UCC-1 charged Entity 2 customers a monthly subscription fee of $99 per month for the Silver Bot with a minimum account balance of $2,000; $249 per month for Gold Bot with a minimum account balance of $4,000; and $499 per month for a Platinum Bot with a minimum account balance of $6,000. UCC-1 kept the fees that he collected for himself.

16. Entity 2's website provided materially false statistics to highlight the supposed success of the bots and extreme profit margins for the bot options available (Silver, Gold, and Platinum). HIGGINS knew that these statistics were false, and that UCC-1 would share them with potential investors. HIGGINS agreed to the use of these false statistics to encourage and entice more customers to make investments.

17. UCC-1 posted or caused to be posted false statements about the bots on the Entity 2's website. For instance, on the Entity 2 homepage it stated that Entity 2 had a "proven track record of 2+ years trading millions of dollars profitably." Under the Past Results section of the website, there were performance results specifically for 2020 and 2021. For 2021, it stated, "Actual trade results in real accounts. This is NOT hypothetical back testing." And for 2020, it stated, "Below are our actual trade stats from 1/1/2020 – 12/31/2020[.] These are actual trade results, not hypothetical back testing." HIGGINS, UCC-1 and UCC-2 knew these statements were false because the algorithm was not used for actual trading for the time periods advertised. Instead, HIGGINS ran the algorithm through historical data as a hypothetical to obtain the results which were posted. As to the results that were posted, there was no live testing, forward testing, or actual trading results. As such, there was no proven track record for these bots. HIGGINS gave the hypothetical trade results to UCC-1 to post to his followers.

18. Underneath the supposed "actual" trade results for 2020 and 2021, UCC-1 posted or caused to be posted specific profitability numbers, total trades, the number of winners and losers,

5

and other statistic that were false. For example, as to 2020, UCC-1 posted or caused to be posted that the Platinum Bot had a total profit of 247.92% and an average profit per month of 20.66%. For the Silver Bot, there was a total profit of 85.2% and an average profit of 7.1% per month. HIGGINS knew this information was false because he was the one who provided the percentages and numbers to UCC-1. Furthermore, UCC-1 did not like the initial profit percentages given to him by HIGGINS and asked that they be changed to higher amounts. UCC-1 explained that he needed higher percentages to sell the profitability of the bots to his customers. HIGGINS knew and was aware that UCC-1 used and passed on this misleading information to help bring in more investors that would therefore increase the volume of trades, commissions and profits for HIGGINS and the co-conspirators.

19. UCC-1 claimed investors could see occasional drawdowns, but the losses would be small, and the investors would always make their money back. This claim was false as there was no guarantee that investor losses would be small or that any money could be remade by investors.

20. Investors made their investment with Entity 2 by making cryptocurrency deposits. FXP served as the brokerage house that would "manage" the deposits. Specifically, after signing up for a monthly subscription with Entity 2, investors would fund the deposit by sending it to FXP. They were then given instructions to link the trading bots between FXP and a website overseen by UCC-1 via Entity 2. UCC-1 and HIGGINS led customers to believe that the trading bots were supposed to automatically operate without any input from the customers. FXP would collect a $4 fee every time a position was bought or sold.

21. HIGGINS knew that he and UCC-1 had made misrepresentations about the algorithm prior to collecting fees and taking investment deposits. UCC-1 pushed for Entity 2 and

FXP to start taking investment money because UCC-1 had a number of clients lined up to invest using the algorithm. HIGGINS, UCC-1, UCC-2 knew that once they went live, they would collect monthly fees and transaction fees when customer positions were bought and sold.

22. HIGGINS was aware that fake online status reports were created for some customers when they logged into view their account. Additionally, through UCC-2, UCC-1 requested that certain trades be deleted from view, even though they had supposedly been entered, so that clients could not see losses from bad trades or unprofitable trades.

23. At least $8,061,028 in cryptocurrency was deposited with FXP to be managed by UCC-1 and Entity 2's bots. Additionally, an investor, hoping to avoid a fee, wired $100,000 to a co-conspirator's bank account intending to invest it with FXP. However, the funds were never deposited into an FXP account.

24. In March 2022, there were significant losses incurred by the investors. Investors wanted to withdraw their funds but were unable to do so despite their requests. Instead, HIGGINS required proof that they were the investor who made the deposits and denied many customers' requests for their funds.

25. Investors were so concerned with their losses, that HIGGINS, UCC-1, and UCC-2 agreed to issue credits to the investors. HIGGINS manually issued credits to customers' accounts at the direction of UCC-1 and UCC-2. However, the investors would only be allowed to make future trades with the credits and would not be able to withdraw the credits and receive a return of their cryptocurrency. In sum, the credits were on paper only.

26. Additionally, investors were led to believe that they had individual accounts, when in fact they did not. All cryptocurrency from customers went into a hedge account where trades were placed using the pooled funds because trades could not take place without funds to back

them. However, the software made it appear as if the investor accounts were segregated from one another. Instead, the funds were held in one master account with a company in Europe. HIGGINS controlled this account and HIGGINS continued to allow the master account to trade. Additionally, because credits were issued, HIGGINS would collect a fee on the trading of the credits. The credits were actually backed by other investors' funds.

27. HIGGINS agrees that he collected more fees than that to which he was entitled. He personally transferred over $4,200,000 into bank accounts that he controlled. From these funds he purchased a home in Florida worth over $2,000,000; a Tesla for $70,000; a vacation timeshare for $35,000; and Rolexes for $44,500.

28. HIGGINS admits that between the amounts of the trades and fees charged, investors had little chance to make any profit, despite being told that they could. HIGGINS admits that he continued to take investments even though the bots were failing. Furthermore, the investments were much higher risk than advertised by UCC-1. HIGGINS knew that investments were much higher risk than advertised.

29. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

30. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: 1/30/24 By: _____
Kimberly M. Shartar
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, IAN TAYLOR HIGGINS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 01/30/2024 _____
IAN TAYLOR HIGGINS

I am Jessica Richardson, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 1/30/24 _____
Jessica Richardson, Esq.
Attorney for IAN TAYLOR HIGGINS